Good morning. I'm Peter Fischer, an assistant state attorney on behalf of the people. Good morning to both of you. Good morning to both, and welcome. Is that song going to be in your eyes, because we can move this? No, no, no. Let us open it. All right. It's not the third degree that we're trying to do. I didn't want you to have to. There is a motion to cite People v. Johnson with the caveat that it's not yet final. Does that motion need the authorization of the authoring judge? Well, go ahead. Two of us were on it, as you know. But if you think it's relevant, which we can get into if you want to really argue it, you're free to cite that as additional authority with the caveat that it's not yet authoritative. All right. Mr. Wimmer. May it please the court. From the cross-examination of the first state's witness all the way to closing argument, the trial court in this case hampered Mr. Lopez's defense at every turn with unwarranted sua sponte objections, discretionary rulings that were biased and favorable. Could I ask you a preliminary question that you might want to give me some assistance with? Sure. If we were to find that there was some judicial misconduct, as you would allege, which is a finding obviously we're not ready to make or you wouldn't be here for oral argument. In any event, if we would make that determination, do we then have to determine whether the error was harmless or prejudicial or not? Or would there be a presumption of prejudice? Your Honor, the standard, under Illinois law, this isn't structural error. It is potentially subject to harmless error analysis, at least in the sense that it has to be shown that the judge's comments were such that they were a material factor in the jury's decision to convict. And the evidence that was presented is part of that. Now, who would bear that burden? In plain error, the defendant bears that burden. Where the objection is properly made, the state has the burden of showing that it's harmless. Now, who would have that burden here? Well, we have the burden of showing the error itself. The error is significant enough to affect the jury's decision-making processes. Once we establish that, the burden is, again, on the state to show harmlessness. Are you sure? Or wouldn't it depend on whether the error that you're pointing to is a sprinkled type of error, which the court then analogizes to plain error, which would shift the burden to you? Or is it going to be the state's burden? I don't think so, Your Honor. Well, this might be a question that if either of you had the answer, I would appreciate it. Your Honor, as I understand the sprinkled doctrine, and as the sprinkled doctrine has been laid out, it's not just merely another form of harmless error. It's an actual exception to the requirements of a contemporaneous objection. But it's analogized to plain error. You can analogize it to plain error. I think it's analogous to plain error in the sense that it's an exception to the requirements of a contemporaneous objection. But it's not the same as plain error because the bases for it are different. Plain error is addressed by the court specifically because of the severity of a certain type of error and the type of effect that it's likely to have on the jury's decision-making processes. The jury's verdict were upon a fundamental right essential to a fair trial. The sprinkled doctrine, by contrast, is set up in situations where it would be wrong to require a contemporaneous objection for multiple reasons. Now, if the error would rise to the level of establishing violence, would it still be subject to harmless error analysis? I think that the question you're asking kind of conflates both of those, both the questions of whether or not there was error and whether or not there's harmless error, whether or not the error is harmless. Well, bias, you can still have the error as harmless, but bias may be a structural defect that would be presumptively prejudicial. If you have a biased judge, wouldn't it be like having a biased jury, which then would not be subject to harmless error analysis? I think, Your Honor, I mean, it is obviously, you know, any potential bias on the part of the jury is very significant. And I don't think that, you know, that should be overlooked. I think that if this didn't fit under the sprinkled doctrine, it would be a potential plain error situation. So, I think this isn't quite the same sort of error as if you had proof that a judge or a juror actually had some sort of foreknowledge about the case or had an interest that would, you know, compel them to vote in favor of one of the parties to the case. At the same time, however, the Illinois Supreme Court has recognized lay jurors are potentially highly susceptible to influence when the court makes... Well, let's talk about what occurred in this case. Would you agree with me that what occurred in this case... You each put forth in your briefs the overlapping but different quotes from the transcript, which is not unusual. Sometimes troubling, but not unusual. And if you read especially the brief, the state pages 27 and 28, where the defense lawyer continues undeterred to ask inappropriate questions, making the same error over and over and over again, and then you look in your brief where you have the reaction to those things, the real total picture is that the lawyer was continuing to do things that would cause a reasonable judge to be annoyed to some degree, at least internally, and the question is whether the judge's reaction to those questions was appropriate, and if inappropriate under the standards that apply, sufficient given, even if you assume we get past the forfeiture issue for Sprinkle or other reasons, sufficient to affect the fairness of the entire trial? Yes. Well, that's definitely one of the questions in this case, Your Honor. It's not the only case. As you know, sometimes the trial judge's objections were warranted. And there were a lot of times when they weren't warranted. Well, does that make a difference with regard to Justice Epstein's question? In other words, if the judge is not infallible, he'll make mistakes. Sometimes those mistakes, those errors, are of a nature where they are reversible errors sometimes, but it can nevertheless be committed in good faith. And within the proper judicial decorum. If he makes such an error in a ruling, and it is in good faith, does that then give you greater latitude to violate that ruling and persist notwithstanding the judge's position that he has already taken, which is then appealable as error, but not a license necessarily to continue on in that same path and deprive the judge of his good faith effort to control the proceedings in his courtroom? No, Your Honor. But that's not what happens here. What we're talking about here is actually two different sets of error. And there's no necessary or logical relationship between them in terms of the trial. There is, and it's one of the most prominent things in the record, the fact that defense counsel kept asking over and over again questions about whether witnesses could, asking witnesses questions about what other witnesses could see. Not an appropriate question, although in this case there was no testimony that anybody was lying or accusing. There is an example which probably will have less dispute as constituting an erroneous decision by the judge, namely the right to refresh memory during cross-examination. Which I would hope that the state would conceive was error. But if the judge makes that ruling, wouldn't you still be bound to follow the decorum of the courtroom not to persist against the judge's erroneous, albeit erroneous, expression of his decision with respect to such evidence? You could ask for a standing objection perhaps, or what have you. But does that give you a license necessarily to persist any more so than you would have if his ruling were a correct one? Now, my inflection may betray an attitude, but it's not intended to. I really don't know at this point whether a distinction should be made where the judge's initial ruling is erroneous as opposed to where it's valid. I don't think that the erroneousness of the ruling affects the decorum of trial in the way you're talking about. I think it affects it in another way. So if I can hit both of those points. You obviously don't have carte blanche to ignore a ruling of the court even when it's erroneous. The judge is in charge in the courtroom. And if there's error, the appropriate solution for it is to argue, preserve that error, and go on appeal. But in the situation you're talking about here, in situations where he was not permitted to refresh recollection, ask questions about whether or not somebody's recollection had been refreshed before trial, counsel simply gave up on the questions in those instances. I think they came up again during later cross-examinations. But he simply asked to make argument to the court. Argument was denied. He moved on. That's separate here from the issue of the questions about what other witnesses could see. I do think the erroneousness of the rulings is important, and it's been recognized in the Illinois Supreme Court in Labyrinth in 1962, in that if a judge is making erroneous rulings and doing so in such a way as to, you know, disparage defense counsel. That's an important caveat, isn't it? Well, it's an important factor simply because there's nothing defense counsel can do to avoid that. I mean, it's definitely, obviously, some of the common... How many did occur, though? Get out of my list. Some of the erroneous rulings in this case. There was the, during the cross-examination of the complaining witness, one of the two most important cross-examinations in the case, the trial court forbade counsel to ask questions about the complaining witness's recollection of Mr. Lopez's appearance, which went through an important detail in her story. And was this one of these memory refresh recollections? No. No. Do you want to go specifically on the memory refresh? No, no. What was this objection? What didn't the court let the lawyer do on her cross? Well, it was what he did not let defense counsel do. Defense counsel was asking questions about her memory of Mr. Lopez, because, again, as she testified, she saw him in close range as opposed to long distance. Oh, yes. Yes, the state objective, the court not only sustained that series of objections, but instead of simply telling counsel to move on, went further and said in front of the jury, you're bad for being a witness. It was an entirely appropriate line of inquiry. Again, later on... Was that the question when he said, did he look any different, or could you see more of his details when he reported to him? Is that the question you're talking about? Yes, the one where he started out asking how did he look to you and how did he look to you. Wasn't there repetition in that line of questioning that traversing over grounds already covered in one form or another in that line of questioning? And if so, the word badgering is more appropriate. Because that is an evidentiary that does express an evidentiary principle, that I'm harassing or badgering the witness. And she didn't know if he had glasses or what color his shoes were or three or four things before that, saying about, well, now that you were closer to him, could you see any better? Had she already said she couldn't tell about a number of things? Right, but he was working her through her testimony in the order that she gave, starting out asking questions about the time when she was looking at somebody who she later identified as Mr. Lopez from across the street. And it's important to the credibility of her story that her memory be consistent with the fact that first she saw him across the street, what he looked like then. Then he, apparently smirking in the depths of the stairwell, comes up and winds up right next to her. Would you recognize that? For whatever usefulness that was. It's a legitimate point, Your Honor. There's a difference between precinct interrogation and interrogation at trial. There is, Your Honor. You might, as a precinct interrogator, ask the same question four or five times in the hopes that a witness will break or vary. But you can't do that in the context of a trial. At least not when the judge doesn't want you to do that, because it's appropriate at some point for the judge to say, in sustaining an objection, that it's a badger. At a certain point. It wasn't warranted here, Your Honor. It was a legitimate line of inquiry. If he wanted to phrase it in a different fashion or simply wanted the defense counsel to move on, he simply could have done that. Didn't he tell them multiple times, you know, that we're not going to do this again and move on? But let me ask you something. In your opening brief, I know at the very end you talk about plain and earnest violence, about timeliness. What was your approach in the opening brief? I know in the reply you sort of talk about Sprinkle and, you know, McLaurin and that in terms of reviewing. But in your opening brief, how did you attack the, you know, numerous rulings? Was it under plain error? Did you simply not address it? And then if the state doesn't, you know, bring it up? That was under plain error. Okay, now let me ask you this. Probably forfeiture not raised by the state. It could happen. No, it can't. Now, the cases, though, that talk about this, you know, when the court deprives the defendant of a fair trial because of their continuing, you know, interference, so to speak. Were any of those cases plain error, do you recall? Like Pressley, Eckert, were they? I don't recall, and I just wondered if you knew offhand. We're dealing with a case, you know, that we don't have any objections, sort of. I'm sorry, I don't have them in front of me. That's all right. I just wondered. It's a legitimate question. I mean, at the same time, though, I mean, this is within the core of the Sprinkle document. I mean, Sprinkle itself. Yeah, I know, and you mentioned that in your reply. So I understand. I just wondered what your approach was. Let's then talk about Sprinkle. Sprinkle obviously has, creates an exception, but talk about why you think that this falls within the Sprinkle exception. Well, a couple of reasons. First of all, I mean, it's simply within the very core of the section that's the rule that the Illinois Supreme Court carved out in Sprinkle itself. It dealt with inappropriate comments by the judge, potentially prejudicing the jury. The two underlying rationales for the Sprinkle doctrine, I think both apply. First, it gives dimension to Sprinkle in ultimately concluding that it has to be extraordinary in order to avoid forfeiture. Yes, and I think that this falls within the extraordinary category. The underlying rationales for the Sprinkle doctrine are twofold. The first is that there are certain sorts of situations where, I believe the language has popped up a bunch, especially in recent opinions, an objection would fall on deaf ears. So requiring an objection would essentially be a meaningless formality, and it wouldn't be fair to deprive the defendant of his rights to raise an error on appeal because of the lack of a contemporaneous objection. And potentially biased statements by the trial judge, an objection to that would fall on deaf ears in a significant enough number of cases that that falls within the core of the Sprinkle doctrine, and specifically in this case. If you want to know if counsel had gone to a sidebar and said, you know, judge, you're really hammering me pretty hard and making unwarranted comments. I'd like you to stop. I'm objecting to that. If you want to know what the sidebar would have looked like, all you have to do is look at what happened when a defense counsel eventually objected to the biased time limits being imposed to this oral argument. What ensued is 20 pages of the record in which defense counsel and the trial judge play a cat and mouse game as the trial judge again and again tends to put as much pressure on the defense counsel as possible while backing off at any point that he says, you know, he's made his record and he's going to, you know, be able to raise that issue on appeal. If defense counsel had made these objections, doubtful that the trial court would have even acknowledged that anything wrong had happened  Isn't that the key distinction, Mr. Wimmer? That that really shows that the trial lawyer for the defense was not intimidated, was not deterred in being a forceful advocate by the reaction of the judge to his examinations and the judge's ruling, but can stand there on his own two feet and raise as error things that he thinks are erroneous. And doesn't that really then highlight the failure to do it in the other context? The state does not really object to what they thought was judicial excess. Your Honor, I mean, I want to say the flaw underlying this question is the assumption that the Sprinkle Doctrine is designed to work in situations where a defense counsel for some reason is like psychologically unable to object. The objection rule in the first place is there for a reason not to just arbitrarily deprive defendants of the ability to assert error in their cases. It's there so that the trial judge will have the opportunity to correct error in the first instance. And in a case like this where it's clear... But that rule stands even where the error is not subject to correction, doesn't it? I mean, you still have to make an objection. Moreover, you have to make a specific objection. General objections don't work. No one has argued that in this case, but all the objections here were general objections. And even just to highlight something Justice Gordon was just talking about, you have situations potentially where somebody makes an utterance, the judge makes an utterance, which really can't be undone. And so there would be no purpose in saying the judge can correct this error. But there's still the requirement that there be a contemporaneous objection. Even where the error is not sort of perfectly correctable or instantly correctable, the point is to give the trial judge a first crack at evaluating any potential error, make any sort of correction that's possible, including, if necessary, an emotion for new trial, which is why, in general, emotion for new trial is required as well as a contemporaneous objection. But none of those rationales apply where, as here, an objection would have fallen on deaf ears. Moving on to the point you stressed, that an objection needs to be very specific. Explain to me why it would have fallen on deaf ears. Walking over it again, Your Honor. If a judge is, in fact, actually demonstrating bias in front of a jury, it's not likely that's going to be some sort of... Well, is sustaining an objection necessarily showing a bias? In sustaining an objection? Yeah. If the court was correct in sustaining an objection for asking someone what somebody else could see, I mean, is that showing a bias to the jury? No. Okay. But a lot of these objections that were sustained were based on this notion that the lawyer kept injecting about what other people could see through the complaining witness's eyes. In all fairness, my reaction to that was not necessarily to give the trial judge carte blanche to sustain all the objections to what someone could see. He could have overruled the objection and still have been correct because it really called for a lay opinion in an area where a lay opinion should probably get some mileage. It was a sharp way of asking questions of the proximity line of sight, which could have been explained that way. Let me go back to what I was trying to get to. So, the judge is properly sustaining an objection when the lawyer is asking the witness whether she could see what somebody else could see. But then later when the judge makes an incorrect ruling about refreshing a recollection, are you suggesting that if he had objected and explained and cited a case or cited any evidentiary treatise that perhaps the judge would not have listened? I mean, so I'm not sure I can accept that this was deaf ears. I think that, you know, there was no effort to even suggest that maybe this ruling was incorrect. Your Honor, actually, defense counsel tried to make argument and the judge shut him down. And as Your Honor may have approached the bench, he says, no, that's just not the right procedure. Keep going. And he does. But during any side, you know, there were certainly enough of those sidebars. And there were times away from the jury when counsel could have made a suggestion about a particular ruling with case citation or treatise or something to suggest that, you know, yes, you're right about the, I'm not supposed to be asking witnesses whether they can tell what somebody else can see. But on this one, I mean, you're just saying that it would fall on deaf ears. But as Justice Epstein had pointed out earlier, when he made an objection regarding the closings, there was kind of a, you know, there was, the judge was listening. And he made the length of the closing arguments. I mean, Your Honor, to call that, you know, listening to the objection, I mean, first of all, I mean, you have to keep in mind what the trial judge actually did there. It wasn't so much a straightforward ruling on the objection. It was sort of backing off. So let's talk about this at the end of the day. Is it enough to simply say the evidence was closely balanced because the state put on witnesses and the defendant put on witnesses? Is that enough to say the evidence is closely balanced? You say it was strictly a contest of believability. But is that really the test for whether the evidence is closely balanced? Well, obviously, it's more complicated than that. But in this case, I think that if you actually look at the stories told by the two sets of witnesses, I mean, both of them had a lot of incredible details in them. You know, as the states observed on the Lopez case, it would definitely have been smarter to, you know, not pull over when somebody's harassing you in traffic. I mean, there's plenty of stories about people getting, you know, robbed on the highways when that sort of thing occurs. And they're getting out of the car and running through the alley. If you had not gotten out of the car, you would have been able to drive instead. Again, you know, not smart. Generally, people try to behave in a smart fashion. On the other side of the ledger, you have kind of strange details in the testimony of the complaining witness, in her Uncle Jose. There's a testimony that Lopez is masturbating openly on the street, apparently in the sight of some woman who just walks by him. It's unclear whether she's reacting, whether she's herself suspicious. He then disappears. The complaining witness walks into the very gangway by which he's just disappeared. Again, as I've said before, you know, unwise behavior. However, there's one basic difference, aside from a number of other variables that could explain it. The one difference is that with regard to the defendant, we have a clear motive or incentive to come up with an alternate version of the events, as opposed to the complaining witness, who, in the absence of being certifiably psychotic or what have you, delusional, or psychopathetic, sociopathetic, in just lying for the sake of lying, to have invented that version. And that's a basic difference. It is a difference, but, well, a couple of things around it. First, I don't think you actually have to say that she's, you know, sociopathic or trying to lie to cases. I mean, she turned it off when he was trying to attack her. Obviously, but there would have to be something where it's a matter of consensus. There would have to be something drastically off-center to encourage or to provoke that kind of invention or fabrication. And it's something that is for the jury to decide. Well, they obviously decided it against you. But this woman, you know, based on, you know, just even limited experience with reading cases and getting familiar with offenses that occur, it's really hard to suggest that this is sort of, you know, an unbelievable scenario that someone would do what he did in the alleyway on any given day, in this city, any other city, what have you. And that the other act where he approaches her at the doorway and sexually assaults her. I mean, I think it's hard for any of us to swallow that this is, you know, kind of an out there story. It's really, it happens. But the fact is, she reacts. She's crying. Two different relatives, and they are related, respond. One actually gets in his car and tries to chase the guy. So he senses that something has happened. And then her uncle, who's answering the back door, also described. And that kind of description has been allowed for a long time. So, I mean, there is a difference in their motivation and his motivation in terms of, you know, what happened. That's true, Your Honor. Your Honor, I think you've latched on to both the potential, all the potential motives. I think if you're getting anywhere with this, it's because of the errors that you complain of. Not the balancing of the evidence necessarily, but whether this kind of conduct of a trial where the judge has to be ruling in an unfavorable way for some good reasons, and then apparently is ruling improperly for other reasons. And it was, you know, from the beginning to the end. So the question is, did that, in the end, impact the decision of the jury? I think you've latched on to it, Your Honor. I mean, once we show that the trial court's, you know, inappropriate comments and rulings were such that they could have a material effect on the jury's decision, the other question should simply come down to, is it, you know, possible that any jury, the harmless error test, could a jury have found that Mr. Lopez was telling the truth and that he was not guilty? Not guilty beyond a reasonable doubt. But that analysis requires a consideration of the strength of the state's case, which you're challenging. But I think we have to look into that, because in addition to the fact that the alibi or the alternate version was far-fetched, it was also at variance with what presumably was told to Detective Leal. So there are really two versions, and leads one to the notion, the possibility, that the story that was told was one that was artfully designed to connect the lines as much as possible as to the visual events that were testified to. Your Honor, that's the best possible argument, I think, that the state would make in closing arguments in a case like this. Of course, the defense had also attacked Leal's interrogation of the two witnesses as well, bringing out information that he had actually let the names of the streets slip. The differences in some of the details were minor. It was about where somebody was meeting. Was it at or near the dog stop, the restaurant? I mean, ultimately, all this comes down to the fact that, you know, a jury could, some jury could have believed Mr. Lopez. Well, you have two eyewitnesses, one who actually saw the charge event, and another who saw the flight and witnessed it, which, Jose, I guess. And then you also have Ibrahim's denial of key factors in the alternate event that was postulated by the defense. The key factors, Your Honor? Yes, to whether they were going to meet at the door of the lawn to study the Koran. Yeah, I mean, that was a detail that came up in the Leal rebuttal. And again, Your Honor, I mean, like, but we've already brought out, you know, some of these witnesses have, you know, they're related to each other. That gives a potential incentive to change their testimony. The defendant is obviously at his freedom at risk here. Do you know precedentially that this kind of case has been treated precedentially as satisfying the overwhelming evidence requirement in determining whether the evidence that came in was sufficient? Your Honor, I don't think so. I mean, when testimony is, like, you know, literally unbelievable, as they say, you know, contrary to human experience, nobody would ever do that. Then, you know, there's no serious possibility of a witness crediting a jury's testimony. But I don't think we have that here. Well, I think that that's part of the question. Do we have it or don't we have it? That car in the alley, you know, has two possible, you can draw two possible things from it, you know? Right. Either that was there, that's how he got there, he parked it, and then he was out on the alleyway where she described him, or that's where he decided to stop when these... He doesn't know there. Yes. And, you know, he had a phone in his car, yet he didn't call the police. So the jury has to assess whether the car was a mere coincidence, that this was the spot where these people supposedly were, you know, going to attack him, or this was where he parked because he was the person that had just attacked or sexually assaulted this woman there and had earlier, you know... So that's really the question. There are certainly cases that could support a suggestion that this is not closely balanced. Well, I mean, two things. I think you've nailed it here. I mean, the question is whether the jury is going to, how it's going to interpret the physical evidence in light of, you know, the witness's testimony and their demeanor on the stand. And also, I mean, bringing up this issue of closely balanced evidence, that's not precisely what we have to show here because we're working under the Sprinkle Doctrine, not the closely balanced evidence. No, that's true. We have to, I think it's just as Gordon was saying, that at some point you're going to have to determine whether this materially affected the outcome. And when the evidence, if you can call it overwhelming, if you have that, then you're not going to be able to show that this conduct of the judge actually impacted the result. Right. And if that were the case, that would be a harmless error. But the error wasn't harmless. The jury could, and credit this guy's story, it's unwise behavior, but people behave in a fashion that's unwise sometimes. It's something that affects the credibility of the story, but it doesn't necessarily destroy it. Would you like to reserve a few minutes? I think that would be good. Mr. Fisher. Good morning, Your Honor, and may it please the Court. Obviously in our briefs, our argument today is that this issue, the first issue, is waived. It's forfeited because, as we pointed out in the briefs, as Your Honors have discussed, this is not an issue that the defendant raised either at trial or in his post-trial motion. On the other hand, the contention is that one of the main utilitarian functions of the objection under the rules of evidence was basically obviated here because the judge's rulings did not show promise of any modification or fluctuation whether an objection was made or not. Well, it certainly didn't stop counsel from, there's two aspects to that. Is the counsel intimidated into not raising these objections? And as we've pointed out, and Your Honors have already commented on it, he certainly wasn't intimidated in this case. He argued many points against the judge and vehemently argued the potential curtailment of the closing arguments issue, and he included that in his post-trial motion. That's the other thing. Well, on the other hand, that ruling was rather unique and stood out from the rest of the rulings. I mean, is it common or uncommon for a judge to maintain a timed delineation between the defendant's defense and prosecution? In my experience, you know, I'm not necessarily going to take judicial notice of it, but it does stand out as being a rather abrupt decision on the part of the judge, which also is a very distinct one, measurable, half hour versus 45 minutes. Objection is almost a spontaneous reaction. That doesn't mean, however, particularly when an attorney knows that a judge is on his case, so to speak, for one reason, whether justifiable or not, that he's necessarily going to interpose an objection at each opportunity. Well, a couple of things. First of all, was it a unique potential, I mean, it was a unique ruling. I agree. I haven't seen this type of a ruling before. Of course, he didn't do it. It could have been at least professionally traumatic, a matter of wonder. How could the judge be doing this? But I will say that there are many cases in which judges impose time limits. Yes, but they don't necessarily say, I'm going to give you some and you're not getting as much. There's no question. I thought you went overboard, Mr. Fischer. I think there's been, at least as far as I was concerned, a, I don't want to say misleading, but a distracting shift in the focus on this distinction in time. It's not a question of whether the time was adequate to get the case out, because in point of fact we know that one case took 34 minutes, another case took a few minutes longer, 40 minutes or whatever, that it wasn't a matter of the adequacy of time in and of itself, although I don't know that the defense is ready to give up that position, but it's the disparity that which reflects bias. That's the focus. That's the focal point. And the question is whether that has merit. Well, whether or not, if it reflects bias, you have to revert to look at who the bias has to be imparted to. It's the jury that has. Now, if the jury is unaware that there are any time limits, then any potential bias there would have been irrelevant. Well, I'm not sure about that, again, because that was part of what I was trying to elicit from counsel when he was up there, and I have the same regard here. I think there is a distinction between an appearance of bias on the part of the judge, which could then mislead the jury, who are at least presumptively devoted to every nuance of reaction that a judge may reflect to them. And that, obviously, warrants an analysis, was there a jury present. But the other is having a truly biased judge. And I think if the judge is truly biased, I think at that point, frankly, prejudice is presumed. Because that's a structural defect. It's a deprivation of the right to a fair trial. I think if you have a biased prior fact, like a Toomey versus Ohio situation, of course we don't have a judge being paid extra for a guilty versus less for a not guilty, like we had in that case. You would have a structural error if you had an actually biased judge, but I don't think that from the comments here you can show that bias. And I also don't think what's really been argued in this case was that there was the appearance of bias was transferred to the jury, even though, of course, we know that the jury was instructed that the things that I say here shouldn't be taken as favoring one side or the other. And cases have held that those instructions are sufficient to cure cases in which... Only with regard to influencing the jury who may be hanging on every nuance of the judge's reaction. But not if you have a truly biased judge, whether it's in front of the jury or whether it's in the lunch counter after or while the jury is deliberating. I think you would still have the same material factor that would be of essence. Was this judge biased or not? Well, I think you'd have to go a lot further to show bias than some rulings on evidentiary matters, the vast majority of which even... I'm not saying that you don't. I think the vast majority of which defense counsel even consider were discretionary matters and the vast majority were, in fact, correct. Were there a couple of issues, and Justice Epstein was encouraging me to address this, so I'll confront it head on. Were there a couple of times where the judge made some rulings that I didn't even understand? And the refreshing of the recollection, frankly, was one. But it's important, as we point out in the brief, it's not raised as a freestanding claim. But, again, I think the main consideration in that area is, as far as I'm concerned, is not whether the judge's rulings were correct or not correct, but was he being fussy? And if he was being fussy, why? Well, I think he was being stern in terms of making the parties follow the rules of evidence. You did have a defense attorney. By fussy, I mean where he could have innocuously ignored the problem. If you have a defense attorney that's continuing to do things... Or a prosecutor. Or a prosecutor, absolutely. Was continuing to do things, then you have to step in. And there were a couple instances here where the judge knocked down the prosecutors, told them to stop. If you recall, at the end of one of the complaining witnesses' testimony, the judge had to step in and straighten out which uncle was which, and he says, okay, fine, I guess that's as straight as we're ever going to get it. There was a time when the state attorney was trying to show some pictures. The judge says, you don't have to do it that way. This is how you do it. This judge isn't a stickler. He was a tough judge who mandated that the parties follow the rules of evidence. Clearly, as we pointed out in the briefs, and as we mentioned here today, there were numerous times where a defense counsel was not following the rules of evidence, and the judge politely, politely, and then more sternly, and then in chambers said stop doing it, and then counsel came back out and started with the same question again and again and again. And at some point, the judge does have a duty to take control of the proceedings. And you also have to remember what was going on here. This is not an identification case. This defendant was there. He admits being there. He doesn't admit fondling the young lady, but he does admit it. Well, I don't know how you can say it's not. That's what the defense was. Well, yes and no. I mean, he admits running into a person in that gangway. He admits being on the scene. Right, but that doesn't mean it's no longer an identification case. I mean, he admitted being there. He said his car was there because he was being, you know, chased by some, as he called them, gangbangers. Right. So, I mean, I don't know. Can you remove your child from the courtroom, please? I don't know how you can say it wasn't identification. That's what the theory was. This is not the person. It was somebody else. I don't think so. I think their theory was really the girl's making up the part about the sex act and that he was the guy. You know, that there's a second guy who matches the same description, wearing the same clothes, who's chased down the same alley. He says, I'm sorry, I'm sorry. I don't take it as an identification case. Didn't he deny the, I'm sorry. He denied the, I'm sorry, I'm sorry part. I thought he did. He did, but. Didn't he explain why his car was in the alley? He explained. He gave a version of why his car was in the alley. Now, whether this is closely balanced, that's a completely different issue. So, I'm not suggesting it. And it does raise some problems with some of the testimony in terms of whether it is something that is credible, including the, I'm sorry, I'm sorry incident, which presumably took place while the defendant was ten feet in front of Jose, who was pursuing him, where the defendant then turned around and said, I'm sorry, I'm sorry. I don't know how many seconds that consumes, if any. But that Jose then could not apprehend him or catch up with him. That is a story that requires some degree of faith. Well, on the other hand, there's really no reason to disbelieve it. The reaction of Jose is a natural reaction. He's seen his niece. But why wouldn't he have been at that point? Why wouldn't Jose have caught up with him if he was only ten feet away? Well, he said he was winded and tired and, you know, he was having trouble, as it was, keeping up with him. He was first keeping up with him in a car, right? He was. And then he got out of the car and ran. Yeah. Yeah. Well, who had the greater reason to get out of there? Jose or this alleged defendant? Obviously, we are arguing that the defendant himself has the greater reason to get out of there. And as we've argued throughout, the defendant's entire story of the gang-battling story is bizarre, pulling off into an alley where he knows he's going to have a confrontation as opposed to calling someone. The story of continuing, going down the street, looking at his car, coming back, going down the street, looking at his car, and then calling a friend to come 20 miles from outside Chicago to come down to Addison, Illinois, to take him to a car that he'd just been to a bunch of times. All of which could be argued actually supports the state's case. Well, exactly. I mean, it's a bizarre series of events for the defendant to argue. Again, we believe the issue is forfeited because this defendant did not argue it, first of all, at trial. And there's no reason not to put it in the post-trial motion. For whatever reason about whether or not you're going to argue it contemporaneously, whether or not you still put it in the post-trial motion. Well, how do you respond? You didn't get a chance because the reply brief really talks about McLaurin, Sprinkles, Thompson for the first time. I mean, if that's where we're going, what is your position in terms of that whole line of cases? They are designed to allow the court to look at errors when the judge's conduct is what is on the line. And that's really what's at the heart of this whole thing, that everything that was done was unfair to the defendant. So that's what we need to hear from you. And I would argue that in these cases, if you look at Sprinkle in those cases, one of the primary doctrines in those cases is the intimidation factor. Whether or not this defendant feels comfortable, feels that he can make this objection without getting his head taken off. Whether or not he can even make the objection, can put it on paper, whatever. And this defense attorney had no qualms about raising these issues as the argument over the time limits shows. He vehemently argued that issue. He also vehemently argued the issue where he was trying to get in through the back door when he wasn't allowed to do it in the front door. If you remember, there was a motion to eliminate to keep the defendant's statements out. We all know the defendant's statements are hearsay offered by the defendant. He tried to use the guise of kind of responding to recent fabrication or claiming a recent fabrication. Clearly a wrong characteristic. Yeah, an erroneous way to get into that. The judge called him on it. He argued it. He says, well, I have a right to do it anyway. And so this is another good example of a case where this defendant did not, this defense counsel did not feel intimidated by the trial court, did not feel he couldn't raise these issues. And so his failure to do it on the other ones is significant. And again, I would point to the fact that it's not in the post-trial motion. And if you rely on the deaf ears segment of that, what's your position about whether if there, as Justice McBride's questions to Mr. Wimmer pointed out, if he had said, well, wait a minute, here's what the law is on, for example, refreshing recollection. And you can do it at any time regardless of whether it's your witness or not. Is there anything in the record that would indicate that when confronted with case law authority or treatises that the judge wouldn't have listened to that? No, there's nothing in the record that says that. And counsel didn't try and do that. His response was, I have a right to do it. When you have a problem child like this lawyer and it's continuous and it's just on and on and on, is there a way that the judge should behave? Or can he, you know, tailor his conduct outside the presence of the jury more? Or does he have carte blanche to, you know, continually sui sponte, sustain these objections? Is there another way to do this? Well, I think he did. He tried. He tried several times. Did he call the sidebars? I don't recall whether he called them or not. And when you say that he was tough or he's a stickler, isn't that almost saying that instead of, shouldn't it always be that he was fair in his rulings as opposed to tough? He's a stickler. He's, you know, this and that. I mean, if he's doing his job, then there's a way of always doing it so that you do look fair. Isn't there?  If you are being fair. There are things that you can't overlook. But I think we want to, if you're going to point to me, you might as well point to the case that I was involved with, Pavlon v. Cafferley. Kimberly. Cafferley. Kimberly. Yeah. Where a witness was totally, the defendant was totally outrageous in that case. There was absolutely no question about the fact that this witness was transgressing every rule of decorum as well as evidence. And was generally, I think by all indications, despicable. But the judge overwrote, overdid in his reaction. The rule is, I think, a very sensible one. These are situations in which a judge earns his salary. Namely, through the exercise of control and restraint. Not reacting excessively. Not overreacting to that conduct. But just doing what it takes sufficiently to maintain the control of the courtroom. Which can, under various circumstances, include calling in the constabulary to put the witness in chains, if necessary. But that doesn't spell prejudicial conduct. If it's not an overreaction, where somehow that triggers a kind of a hostile gland inside the judge's head to permit him to react, not judiciously, but on a personal basis. And he's got to exercise that balance and that restraint. I'm not commenting, obviously, in this case. We'll find out how do we evaluate the judge's conduct when we're ready to decide. I'm not, by any means, saying that this judge necessarily overreacted or underreacted. But that's the subject that has to guide our analysis. We're not, obviously, talking about best practices here. We're talking about whether what occurred was sufficient to require undoing the jury verdict. Right. And I think to do that, you have to see if it had a significant factor in the jury verdict. And when you're analyzing that, you have to, again, look at it from the jury's perspective. And from the jury's perspective, the jury doesn't know whether the judge is right or wrong on any of these calls. So the fact that he got one wrong in front of the jury and got others right in front of the jury, if you get something wrong, that isn't impartial. The jury doesn't know that. Except where a judge may comment on others. That's one of the charges here, that the judge, in regards to the photographs, reassured the jury that they will be taking those photographs with them in the jury room, which can be deemed by the jury to be commenting on the weight or on the sufficiency or credibility of the evidence. And also a situation where if the jury hadn't yet seen the documents, and you may have a juror, for example, craning his or her neck, that the judge's reaction could just as easily be interpreted as saying, don't worry about it, you're going to see all the evidence, including this photograph. In fact, that's our argument in the brief. That should be cleared up one way or the other with the actual record. You say that, and you cite the block of the quote, where the court recorder puts in indicating. Right. Counsel for the defendant says that that's not there. So, I mean, it either is or isn't. I think he's talking about a separate quote, not that indicating quote. There's two points. I thought both, there was a, when the judge chimes in and says you'll see those photographs or you'll see those exhibits in the jury room, was there an indicating by the court recorder or not? Not by what the judge says, no. No, but by what the prosecutor says. No, not at that particular point. That came later, and I was using that to illustrate the kinds of things when the prosecutor was actually talking about the photos. But in context, it makes more sense. And, again, this is, again, another point where the defense counsel didn't object, and then he himself points out you're going to see these pictures. And, of course, the jury was going to see the pictures. And he didn't say these pictures are great, he just said you're going to see them. I understand that defensively. Assuming that the judge's comments were out of line, and I'm not saying they were. I've read your explanation. I've also read the defendant's explanation. I've seen the words indicating in parentheses. So I'm not commenting on the resolution of that. But if the judge's comments were gratuitous, then the fact that the defendant then points to those photographs do not compel a conclusion that it wasn't prejudicial, because that defendant may at that time be trying to sell it. Well, were any of those cases, the Presley and the Eckert, were they plain error? I don't know whether they were. Well, in Presley, one of the statements is that a trial judge has permitted a limited amount of impatience. Now, I'm not sure that I would agree with that general broad principle, but that's what the case says. And a party cannot complain about measured admonitions warranted by their own behavior. Do you think this is a case where there was a limited amount of impatience? Oh, yeah, absolutely. He did. Yes. I mean, the judge certainly, at the one extreme, we have those cases where the judge tells the attorney on the record to take out his wallet and he imposes a contempt fine or something like that. I mean, we have cases like that. Yeah, well, that could be done in chambers very easily instead of in front of any jury. Right, but sometimes it isn't. And then there are other comments about counsel, you know better, on and on and on. At some point, the judge does have an obligation to step in, and I think the judge was correct here. Well, that's what the limited amount of impatience is. Right. But not every other objection sustained. Well, if it's the same question that's asked again and again and again, I don't know what else you're supposed to do. Yeah, well, there's nothing wrong with a plain old objection sustained, and that's not a problem. But if it's not working, what do you do? You have to tip it out. You probably have to take it in the back. And he did. And the comments continue. The same questions continue. I mean, using the television type, summarizing all the questions that have come before and then asking a question. Well, then sometimes I think the reaction is that, you know, the judge is responding with a little more, you know, like measured discipline each time so that he thinks that maybe this will work, you know. I think that's what he did here. Well, I'm not saying that one way or the other. I'm not saying that. I'm just asking the question whether this was what you would call a limited amount of impatience. Obviously, from reading the defendant's brief, that's not how, you know, they've interpreted this as a limited amount of impatience. Again, we're not talking about best practices. I think that probably anybody who reads the record, probably including the trial judge in this case, could think of a better way to have dealt with all of these issues when they arose. Because the question continues to be, in my mind, whether the impatience shown had a material effect on the fairness of the trial. And, of course, we're arguing that it didn't, and we're arguing that you have to look at it through the lens of plain error, and this isn't a structural defect, and therefore you have to look at it through the closely balanced prong. And the evidence in this case was not closely balanced. The question came up earlier about if the defendant puts on some evidence and the state puts on some evidence, does that automatically make it closely balanced? Well, it might make it balanced. When you're talking about closely balanced, you have to conduct an examination of the evidence. I mean, if the defense witnesses come down and said, Martians did this, obviously that's ridiculous and you wouldn't go with it. There are aspects of this case where the defense story is close to that, and therefore we would argue that the reaction of this young girl, why she would make this up, go to court, she was in tears, she was shaking. This is all out of proportion to someone bumping into her in the alley. The notion that there would be two people who look like defendant, who are dressed like defendant, running through the alley, one of them must bless her and the other one knocks her down, it strains fragility. It's not reasonable. Well, either way, though, the defendant's position is that when you have the conduct of a trial that is so unfair and so unreasonable and pushes this notion to the jury that the judge has taken aside, that is clearly either a structural error or it's under the second prong of the plain error doctrine that there's fundamental right to have the trial conducted fairly. So that's what their position is. Yeah, and our position is that unless it falls into one, you can fit it into one of the Glassford-Thompson exceptions, one of the structural error exceptions, and then we go back to the U.S. Supreme Court cases on what structural error. The right to basically a fair trial conducted by a fair tribunal is definitely structural, and so is a fundamental right to have a trial conducted by a judge who is not going overboard. Now, I'm not saying one way or the other whether the judge did it. I think you can argue reasonably that this is one of those cases that the combination of everything that occurred, if you look at it the way the defendant is viewing it, you know, 20-20, that's the complaint. So I agree that, you know, but for both of those, at the end of the day, you do have to decide whether the way it was conducted, whether it impacted, whether it materially affected the decision. Yeah, and I would respectfully disagree. When you start putting in these ideas of fundamental fairness and a general vague notion of fair trial and shoehorning them into structural error, I would say that that's what the Thompson court says we're not supposed to be doing. Yeah, except if the judge were biased. But if he's biased, I don't think you're going to challenge that that would be structural error. I don't necessarily agree with that judgment. But I don't know whether we need to even discuss that because the issue in this case is really not – I mean, all the perceived over-the-top conduct is not to the defendant directly, but to the defense attorney in the context of the questions that are being raised, at least until we get to the closing argument divergence, which is a different issue. But the actual allegation that this judge had a bias against this defendant is, in my mind, a different issue. And if you look at the record, the context, as it evolves during the course of the trial, it becomes pretty clear that it's a reaction to the continuing ignoring of the evidentiary rulings by the court that pushed this judge to his now-complained-of behavior, which is why I call it a derivative claim of bias because it's not a bias against the defendant himself. And again, going back to what I was going to say, and I agree, we don't have to decide this issue here, but if you look at the structural error cases, one of the cases is Toomey v. Ohio. The finder of fact, the trier of fact, was actually biased because that trier of fact was the judge who got more money for convictions than he got for not guilties or whatever it was in Ohio that he was looking at. In this case, the trier of fact is the jury, so we're looking at the effect on the trier of fact. And you have to find a biased jury, not a biased judge. Now, if you had a biased judge... Well, I think that may be an academic question. It is, and I don't think we have that situation as Justice Epstein points out. In any event, for the reasons that I've stated in the brief and here today, we'd ask that you affirm the defendant's convictions and sentence. Mr. Wimmer, any closing thoughts? Just a couple, Your Honor. With no time limit, you know. Still, just a couple. Your Honor, Justice Epstein, you're right. We did not raise an actual claim that the judge was actually biased under the Toomey standard. This is, again, I just want to make sure this is laid out. Our claims that the trial judge's comments, biased rulings in front of the jury caused the jury to have bias. And that's different from a structural error claim that the judge was actually biased or that, you know, a biased juror was placed on the jury. I think to a degree, though, the extent to which one might even be tempted to say that kind of reflects the severity of the comments that were made in this case. Another thing I want to point out is that the increasing, there is a sort of What is the fundamental right that you have to reach to get to us looking at this under the plain error? And what is the structural error for whatever Sprinkle requires? Sprinkle doesn't require structural error. So then what is the fundamental right? Well, the fundamental right is the right to be tried by the jury rather than the judge. You have the right to a jury trial before a non-biased jury on the evidence presented. Under Sprinkle, that right is violated where the jury receives inappropriate comments from the judge that reveal a bias in favor of the state. And moving back, there is a sort of Let me ask you this, Mr. Wimmer. I don't disagree with that concept. But, well, rightly or wrongly, the judge believes that certain evidentiary procedures have to be followed. And it's clear that with the rulings that he has made, that the lawyer continually ignores or flouts those rulings. Is a reasonable jury likely to read that as a bias against the defendant and an indication from the court that they should find the defendant guilty regardless of what the evidence is? Or is the reasonable presumption that a jury could make is the judge doesn't think the lawyer is going about the evidence in an appropriate way, which was the judge's position. And I'm sure all that the judge intended to communicate to the defense lawyer at that point. And if it's not that the jury would take the conclusion that it's so facto a criticism or repeated criticism of the method of inquiry of the defense attorney is to be equated with a suggestion of guilt on the part of the defendant, what is the harm? A couple of things, Your Honor. First of all, that's not precisely the case that we're dealing with here, because there was more going on here than just the defense counsel pushing again and again on, you know, did another witness see something, and the judge coming back harder and harder. The judge becomes increasingly frustrated in this case. He starts coming down on defense counsel in ways that are completely unrelated to what was probably the initial basis for the frustration. And so by the time he gets to Lopez's process… I think that perhaps this is a softball to you in reference to Joseph Simpson. We can make the distinction between reacting to the conduct of the lawyer as opposed to an animus, that that reaction manifests against the client or the defendant. We can make that distinction. The question is, can the jury make that distinction? And if not, then again, a judge will not have uncontrolled license to reflect animosity towards the lawyer, making it very clear it's the lawyer, not the client. But only he has to modulate that reaction to the extent that it is reasonably necessary to control the courtroom, because the jury may very well equate the anger towards the lawyer as being anger towards the client. Yes, Your Honor, you're correct. That is a softball, but it is… It's not a question. It's a softball supported by the previous decisions of this court. I mean, this court has found reversible bias again and again, where a court basically went after a defense counsel on cross-examination, with defense counsel's examinations, made unnecessary comments disparaging performance. We've cited the cases in the briefs to Presley, Stokes, Eckert. And in addition to that, I mean, so there's two points to this. First of all, yes, there can be a basis for reversal. And secondly, it's important to keep in mind everything that happened here. It wasn't just coming down on defense counsel. Eventually, the side started getting treated in a very obviously disparate fashion in cross-examination. During the Lopez cross-examination, the state was permitted to ask over-objection, can you teleport yourself by snapping your fingers? You know, when you ran into this person in the alleyway, was it miraculous? Similar questions, you know, was there anything preventing you from calling 911? The complaining witness has been denied. Now, again, you know, as, you know, state's attorneys noted, you know, these are within the trial court's discretion, but the discretion can't be exercised in a biased fashion. It was pretty nakedly biased here by the end of this case. And if that's a response to defense counsel's, you know, inability to ask appropriate questions to elicit the fact that one witness was in another witness's line of sight, it's an overreaction. It's a reaction that eventually just loses any connection to- Don't you think, counsel, that that determination ought to be made not on the basis of a single overreaction or a single instance, but on the totality of the conduct as against all instances where such bituperative or admonishing language came from the judge that if he oversteps the bounds in one particular instance, is that going to do it? You know, I think that, you know, that's a rhetorical question because I think your answer would have to be no. No. I mean, this court is, you know, again, so stressfully inaccurate. All these cases, they emphasize the number of times that the trial courts, you know, crossed the line of decorum in the courtroom or otherwise, you know, made inappropriate rulings. A couple isolated instances are, you know, as it's been said in some of these cases, limited amounts of impatience. I mean, judges are held to a high standard, but they're nonetheless human and human communication sometimes, you know, just necessarily involves a little bit of emotion. But when it happens again and again and again until the point it just sort of becomes part of the texture of the trial, then you have a... In each instance, nevertheless, one has to look, does one not, for if there was provocation for each of those reactions. Yeah. I mean, you have to examine the entirety of the case. And I think in this case, definitely by the end of the case, the trial judge, you know, he had lost the necessary, you know, decorum and objectivity he needed to show in front of that jury. And this was a material factor in the jury's decision to convict. Any other points you want to make? No. For that reason, I would urge you to reverse Mr. Lopez's conviction. I want to thank both attorneys for a very fine presentation and for fine briefs. And we'll take the matter under advisement and make a ruling in due course. Thank you.